OPINION OF THE COURT
James C. Hudson, J.
The matter at hand is an application by the respondent Mr. Paul McDonnell (also known as O’Dwyer) for unescorted furloughs (CPL 330.20 [10]).
On May 22, 2000 Paul McDonnell (also known as Paul O’Dwyer) attacked Ms. Cheyanne Spoto while she was waiting on a subway platform at the West 4th Street IND station. Mr. McDonnell grabbed Ms. Spoto’s hair and attempted to drag her to the edge of the platform as a train was entering the station. A Good Samaritan intervened and knocked McDonnell to the ground. Although Mr. McDonnell later attacked Ms. Spoto on the train, fellow passengers pushed him off and prevented him from injuring her further. Approximately an hour later, Mr. Ernest Mingione was waiting for a train on the IRT platform located at Broadway and Lafayette Street. Mr. McDonnell pushed Mr. Mingione from behind in the direction of the tracks. Fortunately, Mr. Mingione was able to maintain his balance and immediately notified a token booth clerk. The police were called and Mr. McDonnell was arrested. After being charged with attempted murder in the second degree, attempted assault in the first degree and reckless endangerment in the first degree, Mr. McDonnell was examined by psychiatrists who, in their opinion, determined that he was suffering from schizophrenia and exhibited delusional behavior. Accordingly, he was allowed to enter a plea of not responsible by reason of mental disease and defect to the aforementioned charges (CPL 220.15, 330.20). Mr. McDonnell was committed to the care of the Commissioner of Mental Hygiene since his mental state rendered him dangerous to society and himself. Thereafter, Mr. McDonnell responded to the ministrations of the doctors and other specialists assigned to his care and his condition lessened to that of being “mentally ill” as opposed to “dangerously mentally ill” as those terms are defined in CPL 330.20 (1) (d) and (c) respectively. As the years have passed, Mr. McDonnell’s treating physicians have been impressed with his progress to the point of seeking lesser and lesser degrees of restraint for him. The instant application by the State is for unescorted furloughs off the grounds of the institution to which he is confined.
In order to understand the current legal procedures we follow in deciding the issue of Mr. McDonnell’s liberty, we must *551 underscore that the law treats Mr. McDonnell (despite his being titled “the defendant”) as a person in need of succor, not opprobrium. The reason for this is not a modern construct of social scientists or public whim. Before we proceed to analyze the instant facts, the court is obliged to discuss the history of the law in this area.
The law pertaining to the treatment of persons who have lost their reason and committed crimes is clear and consistent from antiquity to the present day. Indeed, the three great precursors to our common law—Hebraic, Roman and Islamic jurisprudence—are united in their postulations that an insane person cannot be held criminally responsible for their actions, regardless of the heinous nature of the offense (Rita J. Simon & Heather Ahn-Redding, The Insanity Defense, The World Over 4-5 [Rowman & Littlefield 2008]; see also Barbara A. Weiner, Not Guilty by Reason of Insanity: A Sane Approach, 56 Chi-Kent L Rev 1057 [1980]).
The great Corpus Juris Civilis (circa 533 AD) of the Emperor Justinian stated, “There are those who are not to be held accountable, such as a madman and a child, who are not capable of wrongful intention” (Simon & Ahn-Redding at 4). This merely restated law on this subject which had existed from the time of the Law of the Twelve Tables, in other words from the founding of the city of Rome. Moving forward in time, the common law embraced the concept of excusing the insane from criminal consequences, witness the maxim “[fjuriosus solo furore punitur”[1] (Coke on Littleton 247). The common law evolved over the centuries so that the test applied to excuse criminal responsibility went through various permutations. The rule in Rex v Arnold (YB 10 Geo 1 [Eng 1724], reprinted in 16 How St Tr 695, 765 [1816]) was stated by Judge Tracy as requiring an acquittal if the jury found that the defendant is “a man that is totally deprived of his understanding and memory, and doth not know what he is doing, no more than an infant, than a brute, or a wild beast.” The “wild beast” rule was to predominate for some time. Rex v Arnold was followed by discussion in the 1760 trial of Laurence Shirley, 4th Earl of Ferrers, for the murder of his steward, Mr. Johnson. This case is notable for being the first instance of expert psychiatric testimony. There was no doubt of the Earl’s commission of the act or of his suffering from “lunacy.” In his defense, the Earl called Dr. John Monro, *552 supervising physician of Bethlem Royal Hospital (the term “bedlam” came from a corruption of its name) to testify as to the manifestations of his mental illness. Ultimately, the expert testimony was rejected and the Earl went to the gallows (Peter Burke, Celebrated Trials Connected with the Aristocracy in the Relations of Private Life [London: Benning & Co. 1849]). The problem of the times was the inexactitude of diagnosis, the science of medicine lagging behind the demands of the law. “[A]ll the symptoms that Ferrers and Monro had presented to prove lunacy, including common fury, jealousy, quarreling without a cause and going armed when there was no apparent danger, might merely prove a bad heart and a vicious mind rather than lunacy” (Jonas B. Robitscher, The Powers of Psychiatry 22 [Houghton Mifflin 1980]). The law recognized the harshness of a law which demanded that “only those utterly devoid of cognitive function could be excused from punishment.” (Michael Stoll, Miles to Go before We Sleep: Arizona’s “Guilty Except Insane” Approach to the Insanity Defense and its Unrealized Promise, 97 Geo LJ 1767, 1772 [Aug. 2009].) The evolution of the common law toward a more humane treatment of insane persons who committed criminal acts continued as witnessed by the pronouncements of Lord Mansfield in the Trial of Bellingham (54 Old Bailey Sessions Papers 263 [No. 433] [1812]), and finally flowered in M’Naghten’s Case (8 Eng Rep 718, 10 Cl & F 200 [HL 1843]). The fact pattern of M’Naghten’s Case is so famous that it will not be repeated herein but its formula of determining a defense of non compos mentis is important to reiterate. The test of legal insanity, according to the House of Lords, was if the defendant was “labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong” (8 Eng Rep at 722). Variations of the M’Naghten rule (as adopted by New York) have competed with the “irresistible-impulse” test and the “Durham” rule in the intervening 160 years in determining the sanity of criminal actors (2 Wharton’s Criminal Law § 103 [Torda 15th ed]). There have been legislative reactions to the successful assertion of the insanity defense, such as the Insanity Defense Reform Act of 1984 passed in part as a response to John Hinckley’s acquittal for the attempted assassination of President Reagan. Many state legislatures followed suit with companion legislation (e.g. Penal Law § 40.15). Although these statutes may differ from some common-law antecedents in how *553 the insanity defense is to be applied, they do not seriously challenge the principle of excusing insane persons from criminal liability (People v Kohl, 72 NY2d 191 [1988]).
As far as the treatment and care of a person found not guilty by reason of mental disease and defect, the ancestor of CPL 330.20 can be found in the rule stated in Hadfield’s Case (27 How St Tr 1282 [KB 1800]). After being acquitted (by reason of insanity) of attempting to assassinate King George III, the question arose of safeguarding both the defendant and society. The presiding judge, Lord Kenyon, stated that Hadfield was “a most dangerous enemy to society; and it is impossible, with safety, to suffer such a man to be let loose upon the publick, and to permit him to range at large.” (Kathleen S. Goddard, A Case of Injustice ? The Trial of John Bellingham, 46 Am J Legal Hist 1, 23 [2004], citing 70 Gentleman’s Magazine [part II] 688 [1800].) The court therefore, ordered Hadfield to be “returned to prison until a suitable place of confinement could be found for him” (id. at 23 [citation omitted]). This rule was subsequently codified in the Criminal Lunatics Act of 1800. Section 1 of the act provided that in cases of acquittal on the basis of insanity, the defendant could be “detained during his Majesty’s pleasure ‘in such place and in such manner as His Majesty shall deem fit,’ if they constituted a danger to the public.” (Id. at 23, citing Criminal Lunatics Act, 1800, 39 & 40 Geo 3, c 94, § 1 [Eng] [citation omitted].) Thus our complicated mechanism of commitment, retention, orders of conditions, furloughs and orders of release et al., which we find in CPL 330.20 can be traced to the simple and elegant language found in the case of Hadfield and a statute of George III.
The reader of this decision may question the inclusion of Roman Law and common law in the same discussion. In answer we remind them that common law specifically allows for reliance on Roman Law in absence of precedent to the contrary. As Lord Coke observed, “Lex scripta si cesset, id custodiri oportet quod moribus et consuetudine inductum est. . . et si id non appareat, tunc jus quo urbs Romana utitur servari oportet”[2] (7 Coke 19 [emphasis added]).
The court’s study of the law through the centuries on this subject moves us to declare that, truly, the common law is glori *554 ous in its majesty! How facile in application. How just, how fair, how awe inspiring in its careful balancing and integrating, like some magnificent timepiece fashioned by divine hand, the rights not just of individuals, not just of factions, but of whole nations. It is the common law which engenders an orderly society in which the arts, sciences and industry have flourished as never before in recorded history.
The court could have begun and ended its discussion with the operative statute CPL 330.20. From time to time, however, it is well that the courts consider and acknowledge the sages of the past who brought us the legal principles we take for granted, and sometimes, in our conceit, rediscover and claim as innovation. The greatest judges in our land would do well to remember that “quasi nanos, gigantium humeris insidentes, ut possimus plura eis et remotiora videre, non utique proprii visus acumine, aut eminentia corporis, sed quia in altum subvenimur et extollimur magnitudine gigantea.”[3]
To return to the specifics of the case before us, CPL 330.20 (10) provides in pertinent part that
“[t]he commissioner may apply for a furlough order . . . when a defendant is in his custody . . . and the commissioner is of the view that, consistent with the public safety and welfare of the community and the defendant, the clinical condition of the defendant warrants a granting of the privileges authorized by a furlough order.”
The District Attorney of New York County opposed the application which necessitated a hearing. The court held said hearing on November 19, 2013. The State was represented by Assistant Attorney General Rachael Anello, Mr. McDonnell by Mental Hygiene Legal Services Counsel Sheila Ballato and the People of New York County by Assistant District Attorney Sarah Hines. The court would be remiss if it did not commend the aforementioned attorneys for the able and eloquent manner in which they argued their respective causes. The State called a single witness, doctor Azhar Khokar, an expert in the field of psychia *555 try. Doctor Khokar’s prominence in this field was impressive enough that all counsel stipulated to his qualifications on this subject. On direct examination, doctor Khokar testified, inter alia, that he had personally interviewed Mr. McDonnell, the treating psychiatrist on his case, his social worker and nursing staff. Additionally, Dr. Khokar reviewed Mr. McDonnell’s clinical treatment records (petitioner’s exhibit 1). The witness acknowledged that Mr. McDonnell currently suffers from “schizophrenia, residual type” which, in the past, was the precipitating cause of his trying to kill people by throwing them from subway platforms into the path of oncoming trains. The doctor continued, “[I]n my opinion, at the present time he’s not exhibiting any symptoms of schizophrenia at the present time. In other words, his symptoms of his illness are in complete remission at this time” (tr at 11). The Attorney General, on direct examination, brought Dr. Khokar’s attention to a treatment note from Mr. McDonnell’s file dated January 4, 2013 written by an attending registered nurse to the effect that the defendant “appears to be responding more to internal stimuli and makes faces in response” (tr at 14). The witness, however, had not observed such behavior in the defendant and stated that the defendant is not suffering from internal stimuli “at this time” (tr at 14). Doctor Khokar also described the State’s long-term hope concerning the defendant.
“The goals, generally speaking, are to continue his treatment which he is receiving and to observe him and give him more privileges and observe him in a lesser restrictive setting to see how he is using those privileges in order for him to be prepared for eventual discharge back into the community” (tr at 19).
The doctor then described a system utilized by the institution for gradually giving a patient privileges involving a less restrictive environment to ascertain if they can maintain acceptable behavior. Hopefully, the patient succeeds. If not, however, “there are times those privileges can be downgraded if they cannot handle those privileges. So you review those things . . . what happened, what went wrong, how can you monitor that, how you can improve on that” (tr at 21). In Mr. McDonnell’s specific case, the doctor added that “there has never been a time that his privileges have to be [sic] downgraded from a lesser restrictive back to more restrictive settings” (tr at 21). Currently, Mr. McDonnell is allowed off hospital grounds only under escort by a staff member. During these sojourns, the defendant has not exhibited any violence towards himself or others (tr at 24). In response to the Attorney General’s questioning, the doctor *556 detailed Mr. McDonnell’s insight, judgment, and impulse control as being “very good.” In addition to counseling, Mr. McDonnell’s illness is kept in check by use of the drug Olanzapine, which he takes without incident. Finally, in response to the question of “whether unescorted furloughs [for Mr. McDonnell] are consistent with public safety and welfare at this time?”, Dr. Khokar responded “Yes.” He also confirmed that they were consistent with Mr. McDonnell’s welfare. Mr. McDonnell’s attorney questioned Dr. Khokar to the effect that it was emphasized that the defendant is “free of all aggressive behavior” (tr at 36) and appears to exhibit the attributes of a model patient. Indeed, the testimony elicited by counsel demonstrated that the request for unescorted furloughs was not just on the part of Dr. Khokar but from a “hospital forensic committee” consisting of “at least one psychiatrist, a psychologist and a forensic coordinator” (tr at 38). Moreover, the application was approved both by the clinical director of Pilgrim State Hospital as well as the Office of Mental Health’s director of forensic services in Albany.
The District Attorney did not call any witnesses in support of their position and relied on cross-examination. It was brought to the court’s attention that Mr. McDonnell’s improvement has been most marked within the past IV2 to 2 years. In response to the People’s query, the doctor stated that as of January 20, 2012, Mr. McDonnell “was exhibiting certain psychotic characteristics and . . . exhibiting suspiciousness” (tr at 57). Doctor Khokar reiterated, however, that Mr. McDonnell’s present mental state warrants the granting of the application.
Prior to Dr. Khokar leaving the witness stand, the court asked him a hypothetical question:
“Based on your established expertise before the Court, if you were standing on a subway platform yourself and you noticed Mr. McDonnell standing behind you, knowing what you do about Mr. McDonnell’s mental state, would you have a heightened concern for your safety as opposed to if an anonymous person was standing behind you?
“[Dr. Khokar]: If I know everything about Mr. McDonnell?
“The Court: Yes
“[Dr. Khokar]: I would say yes, yeah.
“The Court: You would have a heightened concern?
“[Dr. Khokar]: Yes” (tr at 81-82).
The good doctor’s answer to the court’s hypothetical, given credibly and with all candor, settles the question. In order for *557 the relief requested to be granted, the court must confirm the Commissioner’s belief that the issuance of a furlough “is consistent with the public safety and welfare of the community and the defendant” (CPL 330.20 [10] [emphasis added]). How can public safety be maintained or the welfare of the People of New York, particularly those who carry the sobriquet “straphanger,” be safeguarded under such circumstances? Given the witness’s answer, the court would not oblige him to stand on a subway platform with Mr. McDonnell directly behind him. He should not have to worry, given his “heightened concern,” for his safety. To carry this principle to its logical conclusion, if Dr. Khokar should be protected from such concerns of personal harm, so should everyone who rides the subway. We sincerely hope that medical science one day progresses to the point where Mr. McDonnell can either be cured of his affliction or becomes able to function without cause for concern. Until that happy occasion is manifested to the court’s satisfaction, he shall be closely monitored and remain institutionalized. The application for unescorted furloughs is denied.

. The madman is punished by his madness alone.

. “If the written law be silent, that which is drawn from manners and custom ought to be observed; and, if that is in any manner defective, then that which is next and analogous to it; and, if that does not appear, then the law which Rome uses should be followed.”

. “[W]e are as little persons sitting on the shoulders of giants, so that we can see more things than they, and things at a greater distance, not at any rate by virtue of sharpness of sight on our part, or any physical excellence, but because we are assisted and lifted up by their giant size.” (John of Salisbury, The Metalogicon: A Twelfth-Century Defense of the Verbal and Logical Arts of the Trivium [1159], quoting Bernard of Chartres.)